UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE APPLICATIONS FOR SEARCH WARRANT AND FOR COMPLAINT AND ARREST WARRANT | August 21, 2023 |

**FILED UNDER SEAL**

AUG 21 2023 PM 4:17
FILED_M- USDC - BPT- C

## MASTER AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS AND FOR COMPLAINT AND ARREST WARRANT

I, Daniel J. Lowndes, being duly sworn, deposes and states as follows:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 2021. Upon successful completion of the 16-week DEA Basic Agent Academy in Quantico, I was assigned to the Bridgeport High Intensity Drug Trafficking Area Task Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Norwalk Police Department, Stamford Police Department, Stratford Police Department, Milford Police Department and the Danbury Police Department. Prior to joining the DEA, I was a Police Officer in the City of Burlington, in the State of Vermont for approximately three years.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.      During the course of my career, I have participated in criminal investigations, including investigations into suspected narcotics trafficking. My participation in the investigations has included coordinating controlled purchases of narcotics; utilizing confidential informants and confidential sources; conducting electronic and physical surveillance; analyzing records related to

1

narcotics trafficking; testifying in Grand Jury; and interviewing individuals and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances.

4.      I have debriefed cooperating sources and drug distributors, as well as other local state and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport and package and distribute their illegal drugs, finance their distribution operations, and conceal and launder the corresponding drug proceeds.

5.      Based upon my experience and training, I am familiar with the manner and means commonly employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by them, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement

6.      I know the relative wholesale and retail value of various types of controlled substances including fentanyl.

7.      I am also familiar with the terminology and slang commonly employed by drug traffickers.

8.      As a result of my participation in this investigation through: (a) interviews and the analysis of reports submitted by DEA and other federal, state, and local law enforcement personnel; (b) the analysis of reports of drug seizures and physical surveillance; (c) telephone toll information; (d) confidential informant debriefings; and (e) other reports and documents, I am familiar with all aspects of this investigation.

9.      I submit this affidavit in support of a criminal complaint and application for an arrest warrant charging Jose De Jesus VEGA-Cervantes a.k.a. "Chuey" (xx/xx/1978) with a

violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) (Possession with Intent to Distribute and Distribution of 40 grams or more of fentanyl) (the "TARGET OFFENSE"), and in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the following: (a) 36 Kossuth Street, Norwalk, Connecticut (the "TARGET PREMISES") further described in Attachment A-1; and (b) a white and red Chevrolet truck bearing Connecticut temporary registration 54991 (the "TARGET VEHICLE"), further described in Attachment A-2.  The warrants requested would allow the government to seize evidence described in Attachment B for the TARGET PREMISES and the TARGET VEHICLE, respectively.

10.     Because this affidavit is being submitted for the limited purpose of securing arrest and search warrants, I have not included each and every fact known to me concerning this investigation.  Instead, I have set forth only those facts which I believe are necessary to establish the existence of probable cause to support the issuance of the arrest and search warrants requested herein.

## TARGET OF INVESTIGATION

11.     Jose De Jesus VEGA-Cervantes has been identified as a target of this investigation. VEGA-Cervantes holds a State of Nevada driver's license, however, as listed below, investigators believe VEGA-Cervantes to be residing in Norwalk, Connecticut at the TARGET PREMISES.

12.     Furthermore, DEA agents conducting surveillance prior to the July 7, 2023 controlled purchase, the July 11, 2023 meeting, and the August 5, 2023 controlled purchase, all

discussed above, observed VEGA-Cervantes leaving the TARGET PREMISES before arriving at the pre-arranged meeting location.

13.     VEGA-Cervantes has criminal history which includes the following pending charges: (a) misdemeanor importer use of license registration in violation of Conn. Gen. Stat. § 14-147(c); (b) misdemeanor third-degree assault in violation of Conn. Gen. Stat. § 53a-61; and (c) second-degree failure to appear in violation of Conn. Gen. Stat. § 53a-173.

14.     As a result of my participation in this investigation, and on the basis of other information which I have reviewed and determined to be accurate and reliable, I submit that there exists probable cause to believe, and I do believe, that VEGA-Cervantes has committed, is committing, and will continue to commit the TARGET OFFENSE. Specifically, as described below, VEGA-Cervantes is engaged in the sale and distribution of large wholesale quantities of fentanyl and other narcotics in the District of Connecticut.

## BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

15.     This investigation stems from information initially provided by an associate of a DEA confidential source ("CS")[1] in Norwalk, Connecticut during the month of June 2023, who advised that VEGA-Cervantes was utilizing telephone number 203-906-3798, had provided the CS's associate with a sample of fentanyl, and had given the associate the price of $32,000 per kilogram of fentanyl for future purchases.

16.     On July 6, 2023, the associate of the CS set up a meeting to introduce the CS to VEGA-Cervantes for the purpose of purchasing a quantity of fentanyl. The associate contacted

---

[1]  The CS has been providing information to the DEA since approximately 2019 and was previously a Cooperating Defendant.  CS was arrested by the DEA in July 2019 for distribution of fentanyl and was incarcerated until 2023.  CS started cooperating with agents shortly after his arrest. CS has pleaded guilty and continues to cooperate with the government.  The information provided by CS has been corroborated, proven to be reliable and truthful, and has led to the convictions of additional subjects in the District of Connecticut and the additional seizures of heroin and drug proceeds.

VEGA-Cervantes via 203-906-3798 and VEGA-Cervantes directed the associate to the area of Kossuth Street and Lexington Avenue in Norwalk, CT.  Members of the Bridgeport RO then initiated surveillance.

17.     Prior to the meeting, investigators searched the CS and the CS's associate and the CS's vehicle for contraband with negative results. The CS was equipped with a "kel" transmitter which is a term for a body bug that allows agents to monitor the conversation in real time. Agents then surveilled the CS and the CS's associate to the area of Kossuth Street and Lexington Avenue. Agents observed the CS arrive in the parking lot of 36 Kossuth Street. Investigators conducted multiple drive-bys of the meeting and observed the CS speaking with VEGA-Cervantes.

18.     After several minutes, investigators observed the CS depart the driveway of 36 Kossuth Street. Agents surveilled the CS back to the neutral location. At the neutral location, Agents retrieved the "kel" transmitter and searched the CS, associate and CS's vehicle for contraband with negative results.

### Controlled Purchase of Fentanyl July 7, 2023

19.     On July 7, 2023, members of DEA BRO and Norwalk Police Special Service (NPSS) initiated surveillance in the vicinity of Los Portales located at 49 Fort Point Street, Norwalk, CT in anticipation of a meeting between the CS and VEGA-Cervantes. The purpose of the meeting was for the CS to be provided with 100 grams of fentanyl from VEGA-Cervantes.

20.     At the direction of investigators, the CS made a consensually monitored and recorded telephone call to 203-906-3798. The CS and VEGA-Cervantes agreed to meet at Los Portales. Prior to the meeting, Agents searched the CS and the CS vehicle for contraband with negative results. The CS was equipped with a "kel" transmitter and given $1,600 of Official

5

Advanced Funds ("OAF") to make a drug purchase. Agents then surveilled the CS to Los Portales and observed the CS enter the front door of the restaurant.

21.    Investigators conducting surveillance on the TARGET PREMISES observed VEGA-Cervantes exit the front door of the TARGET PREMISES with a black plastic bag in hand, wearing a white t-shirt and red baseball hat. Agents observed VEGA-Cervantes walk to the TARGET VEHICLE and place the black plastic bag in the bed of the truck. VEGA-Cervantes then entered the driver's seat of the TARGET VEHICLE and departed the area. Mobile surveillance was maintained on the TARGET VEHICLE. Agents observed the TARGET VEHICLE pull to the side of the road at Lexington and Knapp Street and an unknown Hispanic male ("UM") entered the passenger seat. Mobile surveillance was maintained on the TARGET VEHICLE to Los Portales.

22.    Agents observed VEGA-Cervantes and UM park in the parking lot of Los Portales; VEGA-Cervantes initially parked out of direct view of investigators but was subsequently observed walk into the front door of the restaurant. After a few minutes, Agents observed the CS exit Los Portales and enter back into his/her vehicle. Agents surveilled the CS back to the neutral location. Agents retrieved a black plastic bag containing approximately 100 grams of suspected fentanyl from the CS. Agents field tested a small quantity of the product, which was positive for the presence of fentanyl, and submitted the entire exhibit to the DEA laboratory in New York City for confirmatory analysis.

23.    Agents searched the CS and CS vehicle with negative results. Agents retrieved the "kel" transmitter from the CS.  During a subsequent debrief, the CS advised that he/she provided VEGA-Cervantes with $1,600 and the CS agreed to pay VEGA-Cervantes another $1,600 a few days later.  The CS advised to investigators that he/she sat down with VEGA-Cervantes while they

6

ate, and VEGA-Cervantes passed the CS a black plastic bag which contained the 100 grams of fentanyl.

24.     Surveillance was not maintained on VEGA-Cervantes subsequent to the CS departing Los Portales.

### Meeting between CS and VEGA-Cervantes on July 11, 2023

25.     On July 11, 2023, members of the DEA BRO and NPDSS  initiated surveillance in the vicinity of Tio Agustin located at 99 New Canaan Avenue, Norwalk, CT in anticipation of a meeting between the CS and VEGA-Cervantes. The purpose of the meeting was for the CS to provide VEGA-Cervantes with $1,600 that was owed from the purchase of 100 grams of suspected fentanyl on July 7, 2023.

26.     Throughout the day on July 11, 2023, at the direction of investigators, the CS had made a series of consensually monitored and recorded telephone calls to 203-906-3798. The CS and VEGA-Cervantes agreed to meet at Tio Agustin. Prior to the meeting, Agents searched the CS and the CS's vehicle for contraband with negative results. The CS was equipped with a "kel" transmitter and given $1,600 of OAF. Agents surveilled the CS to Tio Agustin and observed the CS enter the front door of the restaurant.

27.     Agents observed VEGA-Cervantes exit the front door of TARGET PREMISES and enter the driver's seat of TARGET VEHICLE. Mobile surveillance was maintained on the TARGET VEHICLE to Tio Agustin. Agents observed VEGA-Cervantes exiting the driver's seat of the TARGET VEHICLE and entered the front door of Tio Agustin. After several minutes, the CS exited Tio Agustin and entered back into his/her vehicle.

28.     Agents surveilled the CS back to the neutral location and searched the CS and CS'S vehicle for contraband with negative results.  According to the CS, he/she discussed drug

trafficking activities with VEGA-Cervantes. Agents heard over the "kel" recording VEGA-Cervantes speaking about drug trafficking with the CS in Spanish.  The conversation was being unofficially translated by a bilingual investigator present during the surveillance. The following include several relevant portions of the conversation:

    a.   VEGA-Cervantes stated to the CS, "I want to bring my table I have in Queens over here." Based on my training and knowledge of this investigation, I believe VEGA-Cervantes has a drug or "stash location" in Queens and wants to move it to Connecticut.

    b.   VEGA-Cervantes asked the CS, "Did you like that?"  Based on my training and experience and knowledge of this investigation, I believe VEGA-Cervantes was asking the CS if he/she though the 100 grams of suspected fentanyl provided on July 7, 2023 was high quality.

    c.   VEGA-Cervantes told the CS, "This afternoon I might take a ride to Rhode Island to see some Dominican friends. It's real good stuff". Based on my training and experience and knowledge of this investigation, I believe VEGA-Cervantes means he is going to travel to Rhode Island to pick up narcotics from his source of supply.

    d.   Further, VEGA-Cervantes said to the CS, "This I have never changed I use and I am calm. I don't talk shit on it." Based on my training and experience and knowledge of this investigation, I believe VEGA-Cervantes means he has never changed his phone number because he does not talk about illegal activities over the phone.

    e.   VEGA-Cervantes told the CS, "I will drop the price down to 32." Based on my training and experience, I believe VEGA-Cervantes means he will sell a kilogram of fentanyl to the CS for the price of $32,000.

### Controlled Purchase of Fentanyl VEGA-Cervantes on August 5, 2023

    29.    On August 5, 2023, members of the DEA BRO and NPDSS initiated surveillance in the vicinity of Fiesta Limena located at 330 Connecticut Avenue, Norwalk, CT in anticipation of a meeting between the CS and VEGA-Cervantes. At the direction of investigators, the CS had made a consensually monitored and recorded telephone call to 203-906-3798. The CS and VEGA-Cervantes agreed to meet at Fiesta Limena for the purpose of having VEGA-Cervantes provide the CS 100 grams of fentanyl.

30.     Prior to the meeting, Agents searched the CS and the CS vehicle for contraband with negative results. The CS was equipped with a "kel" transmitter and given $3,200 of OAF.  Agents surveilled the CS to Fiesta Limena and observed the CS park in the parking lot. Agents conducting physical surveillance on TARGET PREMISES observed VEGA-Cervantes exit the front door of TARGET PREMISES and enter into the driver's seat of the TARGET VEHICLE. Mobile surveillance was maintained on VEGA-Cervantes directly to the parking lot of Fiesta Limena. Agents observed the CS and VEGA-Cervantes meet outside in the parking lot near their vehicles. The CS and VEGA-Cervantes were observed making a hand-to-hand exchange. Specifically, Agents observed VEGA-Cervantes hand the CS a Kellogg Frosted Flakes cereal box. VEGA-Cervantes then got back into the TARGET VEHICLE and left the area. Surveillance was not maintained on VEGA-Cervantes subsequent to departing the parking lot of Fiesta Limena Restaurant.

31.     Agents surveilled the CS directly back to the neutral location. Investigators retrieved the Kellogg Frosted Flakes cereal box from the CS, finding it to contain approximately 104 grams of suspected fentanyl. Agents field tested a small sample which tested positive for the presence of fentanyl. The full exhibit was then sent to the Northeast Regional Laboratory for further processing. The CS turned over the "kel" transmitter and Agents searched the CS and his/her vehicle with negative results for contraband.

**Meeting between CS and VEGA-Cervantes on August 17, 2023.**

32.     On August 16th, 2023, at the direction of investigators, the CS had made a consensually monitored and recorded telephone call to 203-906-3798 for the purpose of purchasing one kilogram of fentanyl. The CS and VEGA-Cervantes agreed to meet in person on August 17, 2023, in person. On August 17, 2023, the CS received a call from VEGA-Cervantes

9

who was utilizing telephone number 203-906-3798. This call was monitored and recorded. The CS and VEGA-Cervantes agreed to meet at Fiesta Limena located at 330 Connecticut Avenue, Norwalk, CT. Prior to the meet, the CS and CS's vehicle was searched for contraband with negative results. The CS was equipped with a "kel" recording device. Agents then surveilled the CS to 330 Connecticut Avenue, Norwalk, CT.

33.    When the CS parked in front of 330 Connecticut Avenue, the CS and VEGA-Cervantes made contact with one another over the telephone. VEGA-Cervantes then told the CS to meet at Tio Agustin located at 99 New Canaan Avenue, Norwalk, CT. Agents surveilled the CS to Tio Agustin where he/she was observed parking in the parking lot. Upon the CS's arrival, Agents observed VEGA-Cervantes standing outside the front door of Tio Agustin. Both the CS and Tio Agustin were observed walking into the restaurant together. After several minutes, the CS exited Tio Agustin and entered back into his/her vehicle.  Agents observed VEGA-Cervantes enter the driver's seat of a grey Cadillac SUV bearing Connecticut registration 846YST. A DMV check shows the registration is registered on a 2004 Red Chevrolet Trailblazer, "Cervantes VEGA," 33 Summit Avenue, Norwalk, CT. Mobile surveillance was not maintained on the Cadillac.

34.    Agents surveilled the CS back to the neutral location and searched the CS and CS'S vehicle for contraband with negative results.  According to the CS, he/she discussed drug trafficking activities with VEGA-Cervantes. Agents heard over the "kel" recording VEGA-Cervantes speaking about drug trafficking with the CS in Spanish.  The conversation was being unofficially translated by a bilingual investigator present during the surveillance.

35.    According to the CS, VEGA-Cervantes advised there is currently 30 kilograms of cocaine in transit from Mexico. VEGA-Cervantes did not know if the kilograms of cocaine are being sent to Connecticut or Rhode Island. VEGA-Cervantes gave the CS the price of $18,500 per

10

kilogram of cocaine. The CS advised to VEGA-Cervantes that he/she wanted the product he/she had purchased in the past from VEGA-Cervantes. According to the CS, VEGA-Cervantes stepped out of Tio Agustin to make a brief phone call. Agents observed VEGA-Cervantes walk out of the restaurant for a brief moment while on the telephone. VEGA-Cervantes then returned to the CS and advised there is one kilogram of fentanyl left for the purchase price of $28,000. The CS and VEGA-Cervantes agreed to speak on August 21, 2023, about purchasing the kilogram of fentanyl.

## CONCLUSION

36.     Based upon the information presented above, I believe that VEGA-Cervantes is engaged in a continuing course of narcotics trafficking activity, including the distribution of 100 grams or more of a mixture containing fentanyl to the CS on July 7, 2023 and again on August 5, 2023 in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), as discussed above, the TARGET OFFENSE.

37.     Based upon the controlled purchases from VEGA-Cervantes, I also believe that VEGA-Cervantes is using the TARGET PREMISES to store, package and/or sell narcotics in furtherance of the TARGET OFFENSE, as observed by investigators on July 7, 2023 and August 5, 2023, and similarly is utilizing the TARGET VEHICLE to store, transport, and/or sell narcotics in furtherance of the TARGET OFFENSE, as evidenced by his use of the TARGET VEHICLE on those same dates.

38.     Based upon the totality of the facts and circumstances set forth herein, my training and experience, my personal involvement with this case, consultations with fellow law enforcement officers, and my familiarity with the practices and methods of narcotics trafficking, I know that:

   a.   narcotics traffickers must maintain on hand U.S. currency in order to maintain and finance their on-going narcotics business;

b. narcotics traffickers maintain books, records, receipts, notes, ledgers, money orders and other papers relating to the transportation, receipts, sale and distribution of controlled substances. The aforementioned books, records, receipts, notes, ledgers, etc., are typically maintained where traffickers have ready access to them, including within their stash houses, residences and automobiles;

c. persons involved in narcotics trafficking conceal in their residences, stash houses or within their automobiles caches of drugs, scales, drug packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities;

d. it is common for narcotics traffickers to hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, stash houses or within their automobiles for ready access and for concealment of these items from law enforcement authorities;

e. narcotics traffickers commonly utilize cellular telephones to conduct their drug trafficking business and that they maintain addresses or telephone numbers in books, papers, cellular telephones or electronic organizers which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization.  Traffickers also maintain photographs and videotapes of participants and associates in narcotic trafficking activity, and property acquired as a consequence of narcotics trafficking activities;

f. narcotics traffickers commonly have in their possession, or at their residences, stash houses and in their automobiles police scanners used to detect law enforcement activity, and firearms, ammunition and other weapons that are used to protect and secure a narcotics trafficker's property.

39.     Specifically, the type of evidence that is typically found at a location from which a drug trafficker operates, and which I anticipate seizing, includes, but is not limited to: United States currency and other financial instruments that may constitute proceeds of drug transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities; records, notes, ledgers and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances; photographs and videotapes of participants and associates in narcotic trafficking

12

activity, including those contained within cameras, cell phones and other personal electronic devices; contraband, quantities of narcotics, scales, residue of narcotics, cutting agents and other drug paraphernalia; addresses or telephone numbers in books, papers, cellular telephones or electronic organizers and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic trafficking activity; police scanners; firearms, ammunition and other weapons; key-lock and combination safes and other secure storage containers and their contents; identification documents and keys evidencing a possessory interest in the premises, vehicles and storage containers, all of which constitute evidence, fruits, and instrumentalities of the TARGET OFFENSE.

40.     Based on my investigation, and the investigation of others, there is probable cause to believe and I do believe that the items set forth above, all of which constitute contraband, fruits and instrumentalities of the TARGET OFFENSE will be found within the TARGET PREMISES and the TARGET VEHICLE.   These items would constitute evidence of and a means of committing the criminal offenses referred to above and would be instrumentalities of the commission of federal narcotics trafficking offenses.

41.     WHEREFORE, I respectfully request the issuance of a criminal complaint, charging VEGA-Cervantes with violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and the issuance of an arrest warrant allowing DEA Agents and other federal agents, with proper assistance from state and/or local law enforcement officers, to arrest VEGA-Cervantes for violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and to search and seize the items described above from the TARGET PREMISES and the TARGET VEHICLE.


                              Respectfully submitted,


                              _____
                              DANIEL J. LOWNDES
                              SPECIAL AGENT
                              DRUG ENFORCEMENT ADMINISTRATION


Subscribed and sworn to before me on this 21 st day of August, 2023. *at Bridgeport, CT.*


_____
HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE


14

## ATTACHMENT A-1

### TARGET PREMISES to be Searched

The TARGET PREMISES is located at 36 Kossuth Street, Norwalk, Connecticut. The TARGET PREMISES has blue and white siding. Agents have observed VEGA-Cervantes exit the front door which is accessible from the driveway and has the number 36 affixed to the house directly above the front door.



## ATTACHMENT A-2

### TARGET VEHICLE to be Searched

The TARGET VEHICLE is a red and white Chevrolet truck bearing Connecticut Combination 5499. A registration check did not return any results and investigators believe this to be a fictitious registration.



## ATTACHMENT B

### Particular Things to be Seized

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to, fentanyl;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds;

6. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives,

18

flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph;

11. Firearms, ammunition, holsters, and weapons and destructive devices; and

12. Safes and other secure storage containers.